[Cite as *State v. Grad*, 2012-Ohio-1385.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | | |

| | |
|---|---|
| STATE OF OHIO | C.A. No. 10CA0003-M |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| LAURA GRAD | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | CASE No. 08-CR-0387 |

DECISION AND JOURNAL ENTRY

Dated: March 30, 2012

BELFANCE, Presiding Judge.

{¶1} Defendant-Appellant Laura Grad appeals from her convictions for child endangering in the Medina County Court of Common Pleas. For the reasons set forth below, we affirm in part and reverse in part.

I.

{¶2} Mrs. Grad and her husband, Alex Grad, are the parents of two children, A.G. and W.G. A.G. was born September 21, 2006, and W.G. was born May 7, 2008. Both of Mrs. Grad's pregnancies were uncomplicated and both children were born healthy. As there was no suggestion that A.G. was subject to abuse, the offenses at issue in this case concern W.G.,

{¶3} A visiting nurse visited the Grad home on May 13, 2008, to check on W.G., and, according to Mrs. Grad, did not note any problems with W.G.'s health. W.G. was supposed to have a ten-day check-up with his pediatrician; however, as W.G. was appropriately gaining weight and just had a visit from the home nurse, the Grads canceled the ten-day appointment. In

late May 2008, sore raw areas began to develop around W.G.'s mouth. W.G. also developed what Mrs. Grad characterized as diaper rash in the area underlying his scrotum that opened up. Further, Mrs. Grad began to notice that W.G. was not moving his left side as much as his right side. The Grads took W.G. to the pediatrician, Dr. Oehlenschlager, on June 4, 2008. During that visit, Dr. Oehlenschlager diagnosed W.G. as having impetigo on both his mouth and near his scrotum. The doctor prescribed antibiotics. Nothing in Dr. Oehlenschlager's exam caused him to suspect child abuse. Mrs. Grad did not ask Dr. Oehlenschlager, however, about her observation that W.G. moved his left side less because, during the visit, W.G. seemed to be moving both sides equally well.

{¶4} On June 6, 2008, Mrs. Grad took W.G. and A.G. to play group, as she had done for the past few Fridays while she was on maternity leave. One of the moms at the group commented that W.G.'s foot was a little puffy. Someone suggested taking W.G. to the doctor. Mrs. Grad indicated that she had to go to a wedding the next day and that there would be a nurse there that she could ask about it. Mrs. Grad attended the wedding and did ask the nurse about W.G.'s foot and asked if the swelling could be caused by a bug bite. The nurse agreed that it could be and suggested soaking the foot in Epsom salt. Mrs. Grad followed the nurse's suggestions for a couple days, but the foot became more swollen.

{¶5} Thereafter, Mrs. Grad contacted her father-in-law, who was a podiatrist, to ask him what he thought about W.G.'s foot. Mrs. Grad's father-in-law thought maybe the foot had somehow got twisted and suggested icing it. Mrs. Grad iced the foot for the next couple days, however, W.G.'s foot continued to become more swollen and tender. That Friday, June 13, 2008, Mrs. Grad called and set up a doctor's appointment for W.G. for that day. Later that day, Mr. Grad called and canceled the appointment; instead, Mr. Grad procured an appointment with

a podiatrist his father knew for Tuesday. Despite the fact that the podiatrist made an effort to get Mr. Grad to bring W.G. into his office prior to Tuesday, Mr. Grad told Mrs. Grad that the podiatrist said it was fine to wait until Tuesday to take W.G. for an appointment.

{¶6} On Saturday June 14, 2008, Mr. Grad gave W.G. a bath. Afterwards, Mr. Grad brought W.G. downstairs and handed him to Mrs. Grad. W.G. was crying and Mrs. Grad swaddled him and was able to calm him down. About an hour later, Mrs. Grad noticed a red mark on W.G.'s forehead. She proceeded to ask her husband about it. Mr. Grad stated that he tripped while carrying W.G. and that W.G.'s head hit the dresser. Mr. Grad indicated that he did not tell Mrs. Grad about it because she was always complaining that he was not gentle enough with W.G. When Mrs. Grad got up with W.G. that night, a bruise had developed on W.G.'s forehead. While Mrs. Grad was concerned given the size of the bruise, W.G. was acting normal and did not have any signs of a concussion and so she did not take him to the hospital.

{¶7} On Tuesday, June 17, 2008, the Grads took W.G. and A.G. to the podiatrist to have him examine W.G.'s foot. W.G. cried the entire time that he was at the podiatrist's office. When the podiatrist examined W.G. he was immediately concerned that either W.G. had a fracture or a serious infection. W.G's foot was extremely swollen and tender and the podiatrist noted that the same leg had an abnormal indentation. In addition, W.G. was extremely upset when the podiatrist tried to move the affected foot or leg. The podiatrist contacted W.G.'s pediatrician and the two agreed that the Grads should immediately take W.G. to Akron Children's Hospital.

{¶8} W.G. was first seen in the emergency department and was later admitted to the hospital. Scans of W.G.'s body revealed more than 25 fractures of various ages throughout W.G.'s body. His injuries included a skull fracture, fractures to all his long bones, all fingers of

his right hand, and rib fractures, among others. In addition, doctors at Akron Children's described W.G.'s scrotal injury, which was previously treated as impetigo, as a laceration, which they believed could only be caused by abuse. Further, the doctors believed that W.G.'s fractures were also highly suggestive of child abuse, given that the parents failed to provide an explanation for the injuries (aside from the skull fracture) and tests failed to indicate that W.G. suffered from any medical condition which would predispose him to fractures. W.G. required casting of all his limbs. Once the investigation into the cause of W.G.'s injuries began, Mrs. Grad agreed to voluntarily answer questions. Mr. Grad refused to speak to anyone.

{¶9} As a result of W.G.'s injuries, Mrs. Grad was indicted for two counts of child abuse in violation of R.C. 2919.22(B)(1)(E)(1)(d) (with one count spanning the timeframe between May 26, 2008, to June 4, 2008, and the remaining count spanning June 6, 2008, to June 17, 2008) and two counts of child endangering in violation of R.C. 2919.22(A)/(E)(2)(c) (with one count spanning the timeframe between May 26, 2008, to June 4, 2008, and the remaining count spanning June 6, 2008, to June 17, 2008). The child endangering counts alleged that serious physical harm was caused, elevating the offense to a third-degree felony.

{¶10} The case proceeded to a bench trial. The trial court found Mrs. Grad not guilty of the two counts of child abuse and guilty of the two counts of child endangering. Mrs. Grad was sentenced to a total of five years in prison. Mrs. Grad has appealed, raising two assignments of error for our review.

## II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT DENIED APPELLANT HER DUE PROCESS RIGHTS
AS THE CONVICTION FOR CHILD ENDANGERING IN BOTH COUNTS
WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶11}** Mrs. Grad asserts in her first assignment of error that her convictions for child endangering are against the manifest weight of the evidence. In her merit brief, she appears to assert that the weight of the evidence does not support the conclusion that she was reckless or that she was "aware of the substantial risk of serious physical harm to [W.G.], and * * * that [Mrs. Grad] violated her duty to care for or protect the child." We agree with Mrs. Grad with respect to count II of the indictment which specified that Mrs. Grad violated R.C. 2919.22(A)(E)(2)(c) during the time period of May 26, 2008, through June 4, 2008.

**{¶12}** In reviewing a challenge to the weight of the evidence, the appellate court

> "[m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

*State v. Thomas,* 9th Dist. Nos. 22990, 22991, 2006–Ohio–4241, ¶ 7, quoting *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

**{¶13}** In reversing a conviction as being against the manifest weight of the evidence, "the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thomas* at ¶ 8, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 388 (1997). In making this determination, this Court is mindful that "[e]valuating the evidence and assessing credibility are primarily for the trier of fact[,]" *State v. Shue*, 97 Ohio App.3d 459, 466 (9th Dist.1994), and our task is to determine whether such assessments are unreasonable in light of the evidence. Accordingly, "this Court's 'discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thomas* at ¶ 8, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶14} Mrs. Grad was convicted of two counts of child endangering in violation of R.C. 2919.22(A)/(E)(2)(c). The indictment specifies that one of the counts involves May 26, 2008, through June 4, 2008, and the remaining count involves June 6, 2008, through June 17, 2008. It appears from the record that the focus of the first count is the injury to W.G.'s scrotum and the focus of the second count is the injury to W.G.'s head and the injuries to his foot and leg.

{¶15} R.C. 2919.22(A) provides that "[n]o person, who is the parent * * * of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." "If the violation is a violation of division (A) of this section and results in serious physical harm to the child involved, [the offense is] a felony of the third degree[.]" R.C. 2919.22(E)(2)(c). A "'[s]ubstantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "It is not necessary to show an actual instance or pattern of physical abuse on the part of the accused in order to justify a conviction under R.C. 2919.22(A)." *State v. Kamel*, 12 Ohio St.3d 306, 308 (1984). "[A]n inexcusable failure to act in discharge of one's duty to protect a child where such failure to act results in a substantial risk to the child's health or safety is an offense under R.C. 2919.22(A)." *Id*.

{¶16} The Supreme Court has held that "[t]he existence of the culpable mental state of recklessness is an essential element of the crime of endangering children under R.C. 2919.22(A)." *State v. McGee*, 79 Ohio St.3d 193 (1997), syllabus.

> A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.

R.C. 2901.22(C).

{¶17} This Court has thoroughly and independently reviewed the record before us. We note that, on appeal, Mrs. Grad does not dispute that W.G.'s injuries were caused by ongoing physical abuse. Thus, it is from that premise we proceed with our discussion.

{¶18} The trial court in this matter was faced with the monumental task of hearing, evaluating, and weighing what amounts to be approximately 2000 pages of transcribed testimony. Further, the case was far from simple or straightforward. The evidence presented was far from conclusive with respect to the indicted charges. This is evidenced by the fact that the trial court, as trier of fact, did not believe that the State established beyond a reasonable doubt that Mrs. Grad was the perpetrator of the abuse given that it found Mrs. Grad not guilty of the two counts of child abuse. Thus, the question before this Court is whether the trial court's determination that Mrs. Grad recklessly "create[d] a substantial risk to the health or safety of [W.G.], by violating a duty of care, protection, or support[,]" which resulted in serious physical harm to W.G., R.C. 2919.22(A), (E)(2)(c), was against the manifest weight of the evidence.

**May 26, 2008 - June 4, 2008**

{¶19} Count two of the indictment alleged that, between May 26, 2008, through June 4, 2008, Mrs. Grad recklessly created a substantial risk to W.G.'s health or safety by violating a duty of care, protection or support, in violation of R.C. 2919.22(A), and that that violation caused serious physical harm to W.G. We conclude that Mrs. Grad's conviction under this count is against the manifest weight of the evidence.

{¶20} During this time period, we cannot say that the weight of the evidence supports the conclusion that Mrs. Grad acted recklessly with respect to whether W.G. was being abused or that she unreasonably failed to get him necessary medical attention. Before discussing the timeline of events, we begin with a discussion of salient facts adduced at trial which might have

supported the conclusion that Mrs. Grad suspected or should have suspected Mr. Grad of child abuse. We note that Mrs. Grad was a trained crisis counselor and had previous instruction in recognizing the signs of child abuse. Further, her license required her to report any suspected incidents of child abuse. At trial, a neighbor testified that Mrs. Grad had told her that W.G. was fussy since birth and that Mr. Grad and W.G. were not bonding well. Mrs. Grad testified that W.G. was always fussier with Mr. Grad than with her. Mrs. Grad found that she could more easily comfort W.G. and that W.G. responded well to swaddling. In addition, the neighbor testified that Mrs. Grad told her that Mr. Grad only wanted girls. Moreover, there were several people, including Mrs. Grad, who testified that Mrs. Grad had stated that Mr. Grad was too rough with W.G. For example, an ongoing case worker at Medina County Job and Family Services who interviewed Mrs. Grad after W.G. was brought to the hospital testified that Mrs. Grad told her that Mr. Grad "was too rough with the baby but not abusive." When the case worker asked for examples of what Mrs. Grad meant, Mrs. Grad told the case worker that Mr. Grad:

> didn't support [W.G.'s] head very well, [Mr. Grad] yanked his legs when changing his diapers and that [Mr. Grad] was probably going to be mad about [Mrs. Grad] telling [the case worker] that because they argue about it all the time about [Mr. Grad's] care and how newborns are fragile and him insisting that he can do it[.]

In addition, there was testimony from one of the mothers at a play group Mrs. Grad attended with her children that on one occasion W.G. had blood blisters under his nails. When the mother asked Mrs. Grad about it, Mrs. Grad told her that Mr. Grad had just trimmed W.G.'s nails too short.

{¶21} With that framework in mind, we move on to discussing the series of events that occurred prior to and between May 26, 2008, and June 4, 2008. By all accounts, Mrs. Grad's

pregnancy with W.G. was uncomplicated, and W.G. was born healthy on May 7, 2008. When Mrs. Grad brought W.G. home from the hospital, she stopped to visit her cousin. The Sunday of that week, Mrs. Grad's mother came to the Grad home and stayed with them for several days. On May 13, 2008, a visiting nurse visited the Grad home to check on W.G. There were no concerns about W.G.'s health or weight at that time. Beginning in mid-May, Mrs. Grad began taking W.G. and A.G. to a once-weekly play group that met on Fridays. During the following week, a few friends of the Grads dropped by the house to visit the baby for short periods of time, and, on May 22, 2008, Mrs. Grad's in-laws and Mrs. Grad's aunt came to visit.

{¶22} Around May 22, 2008, a rash and/or sores began to develop outside the corners of W.G.'s mouth and nose. Several witnesses at trial testified to the existence of these irritated areas. No one commented that they believed these injuries required immediate medical attention or that they suspected they were the result of abuse. Mrs. Grad's brother visited May 29, 2008, and the Grad family attended a Memorial Day party at a friend's house. Mrs. Grad testified that around this time the rash around W.G.'s mouth began to worsen and open up; in addition, W.G. developed what Mrs. Grad described as "a spot of diaper rash on his scrotum which also opened up." She first noticed the scrotal injury, which would later be described by the doctors in the hospital as a laceration, around May 30, 2008. She did not notice how the injury happened and she never saw it bleed. When the diaper rash "opened up[]" Mrs. Grad began putting Vaseline and Neosporin on it. She asked her husband about it, and he said he had noticed it. Mrs. Grad told her husband that they would have to try to make sure the area stayed very clean. On June 2, 2008, Mrs. Grad made an appointment for June 4, 2008, to have W.G. examined by the pediatrician.

{¶23} On June 3, 2008, Mrs. and Mr. Grad took W.G. and A.G. to their respective workplaces. Several people had the opportunity to see and interact with W.G. Mr. Grad's employer observed Mrs. Grad changing W.G.'s diaper. The employer noticed the scrotal injury and testified that it did not look like it did in the picture taken June 17, 2008; instead, she said the injury looked ulcerated and crusted over. She testified it looked "pretty awful" and would have recommended that the Grads take W.G. to the doctor if they already had not had an appointment for the next day.

{¶24} On June 4, 2008, the Grads took their children to the pediatrician particularly to address W.G.'s sores around his mouth. While they were there, Mr. Grad pointed out the scrotal injury to the pediatrician. The pediatrician believed that both areas were infected with impetigo, a condition treated with antibiotics. While he testified that the impetigo would not have caused the erosion, none of his testimony even suggests that he suspected W.G. was being abused or that the injury was a serious condition requiring immediate care. This is in contrast to the doctors that saw W.G. when he was taken to the hospital on June 17, 2008. Those doctors described the scrotal injury as a laceration that required force to inflict and would have required stitches to close when initially inflicted. By contrast, on June 4, the pediatrician described the injury as an erosion and said despite the fact that it looked the same size as that depicted in the photograph taken on June 17, 2008, he would not have described the injury as a laceration.

{¶25} In addition, the pediatrician testified that he did not observe any evidence of any broken bones during the June 4 visit. Further, while Mrs. Grad had noticed that W.G. was not moving the left side of his body as much as his right side, she testified that she did not bring that up to the pediatrician because W.G. was moving both sides normally. Notably, the pediatrician commented in his records that during that visit, W.G. was moving all limbs equally well.

{¶26} When the pediatrician was asked if the non-abusive parent would be able to tell that an infant was being abused outside of the parent's presence, the pediatrician responded that, if there were no external manifestations, such as bruising and swelling, it could be difficult to know that anything was wrong. The pediatrician agreed that someone looking at W.G. on June 4, 2008, who did not have any swelling or bruising along his bones, would not have been able to tell that he had several broken bones at the time. In addition, the pediatrician did not make any notes that W.G. was excessively fussy. When asked about the signs of child abuse committed outside a parent's presence, including evidence that an infant has suffered fractures, the pediatrician stated that "[y]ou might notice a change in disposition of the baby but that can be tricky, too because some babies are fussier than others on a baseline period so it could be difficult to discern that."

{¶27} While all the doctors who testified agreed that the fractures W.G. had by June 4, 2008, would have caused him pain and that W.G. would have been fussy when affected limbs were moved, there was also testimony that from the pediatrician and Dr. Steiner (who examined W.G. during his hospital stay) that it would have been difficult to know W.G. suffered from multiple fractures. Specifically, Dr. Steiner testified that "there may not be any signs. There may be some swelling, modest swelling, there may be some pain with movement but there may not be much in the way of external signs with those fractures." Later, he testified that "these fractures many times do not have any symptoms apparent or signs of appearance externally to inspect." Thus, according to Dr. Steiner, unless she observed the injury or had reason to suspect an injury, Mrs. Grad would likely not have been able to tell that W.G. had the extensive fractures by simply looking at him.

**{¶28}** In light of the above, we conclude that Mrs. Grad's conviction for recklessly creating a substantial risk to the health or safety of W.G., by violating a duty of care, protection, or support from May 26, 2008, through June 4, 2008, was against the manifest weight of the evidence. *See* R.C. 2919.22(A). The injuries W.G. had at this point in time would have been the mouth sores, the scrotal condition and several fractures. With respect to the scrotal injury, the weight of the evidence only supports the conclusion that Mrs. Grad did not violate a duty of care, protection, or support. Mrs. Grad took W.G. to his pediatrician on June 4, 2008 for conditions that were discovered only on May 30, 2008. The pediatrician was not alarmed or overly concerned by the condition he observed on the child's scrotum or his mouth. The pediatrician did not testify that these conditions were indicative of abuse, nor did he report the incident as suspected abuse. If a trained physician did not believe that W.G.'s injuries were indicative of abuse, we cannot say that it would be reasonable to conclude that Mrs. Grad should have suspected abuse. Further, we cannot conclude it is reasonable to convict her of violating a duty of care, protection, or support to W.G. with respect to that injury under circumstances where there was no evidence that Mrs. Grad observed any abuse and where she sought medical care within a reasonable timeframe in light of the observable conditions, which, although of concern, were not substantially acute or life threatening in nature.

**{¶29}** Finally, with respect to W.G.'s fractures, the weight of the evidence does not support the conclusion that Mrs. Grad was reckless with respect to their existence. The pediatrician certainly did not suspect that W.G. had any fractures, and even Dr. Steiner, also a witness for the State, testified that, if Mrs. Grad did not see the abuse or have reason to suspect it, she likely would not know that W.G. had these fractures. Notably, even when W.G. was taken to the hospital, none of the physicians who examined W.G. could visibly discern that W.G. had

suffered fractures until the x-rays were completed. Furthermore, despite the extensive fractures, W.G. was not crying excessively or in notable distress during his June 17 examination in the emergency room.

{¶30} Moreover, the weight of the evidence does not support the conclusion that Mrs. Grad had reason to suspect her husband of child abuse. While there was testimony from Mrs. Grad that Mr. Grad was rough with W.G., there was no testimony indicating he was abusive. No one testified that W.G. cried excessively, nor was there testimony that people were concerned about W.G.'s well-being, or, aside from Mrs. Grad, by the way Mr. Grad interacted with him. None of the neighbors, extended family members, friends, or co-workers testified that they suspected W.G. was being abused or that he appeared to be in need of immediate medical attention during this time frame. Further, Mrs. Grad did not keep W.G. at home, which would support the conclusion that W.G. was being abused and she was attempting to hide it; on the contrary, Mrs. Grad had frequent visitors, took her children to play groups, and took them to her and her husband's workplaces. In addition, once W.G had been examined at the hospital, witnesses stated that Mrs. Grad was genuinely surprised and upset when learning of W.G's injuries and she immediately cooperated when questioned. In light of all of the evidence presented, we cannot say that Mrs. Grad recklessly created a substantial risk to the health or safety of W.G., by violating a duty of care, protection, or support from May 26, 2008, through June 4, 2008. R.C. 2919.22(A). Accordingly, we sustain Mrs. Grad's assignment of error in part.

**June 6, 2008 – June 17, 2008**

{¶31} The trial court also found that Mrs. Grad recklessly created a substantial risk to the health or safety of W.G., by violating a duty of care, protection, or support during the time

period from June 6, 2008, through June 17, 2008. Although, without question, there is much evidence negating the commission of this offense, there was also evidence which supported a finding of guilt with respect to this offense. We conclude that the trial court's determination is not against the manifest weight of the evidence. R.C. 2919.22(A). We initially observe that, while the State focused on whether Mrs. Grad knew or should have suspected that W.G. was being abused by her husband, Mrs. Grad could also have been convicted of violating R.C. 2919.22(A) if she unreasonably failed to get medical attention for W.G.'s injuries, irrespective of the cause. *See Kamel,* 12 Ohio St.3d at 309-310 ("By his own testimony, Dr. Kamel personally examined his son in his final hours. Yet, no steps were taken by the doctor to secure medical attention for his son or prevent any further injury to him. Certainly, this was not consistent with his parental duty of care."); *State v. Hill,* 8th Dist. No. 2001CA00395, 2002-Ohio-6285, ¶ 29 ("There was evidence in the record that appellant violated her duty to Markel, her son, by failing to seek medical treatment for him when she should have known that he was suffering from bone fractures and that her failure to act resulted in substantial risk to Markel's health or safety."); *State v. Allen*, 9th Dist. No. 17017, 1995 WL 641134, *7 (Nov. 1, 1995) ("The jury did not lose its way in concluding that defendant breached her duty of care to the victim by failing to seek necessary medical treatment for her.").

{¶32} On June 6, 2008, Mrs. Grad took W.G. to play group. Someone there commented that W.G.'s left foot looked a little puffy. Mrs. Grad told that person that she was attending a family wedding the next day and that there would be a nurse there, and she would ask the nurse about it. At least one of the moms at the play group suggested that Mrs. Grad take W.G. to the doctor to have the foot examined. Mrs. Grad responded that Mr. Grad did not think there was a need to have a doctor look at it.

{¶33} On June 7, 2008, the Grad family went to a family wedding. Prior to the wedding, Mr. Grad told Mrs. Grad that he took a needle to drain a blister that was on the bottom of W.G.'s left foot. At the wedding reception, Mrs. Grad had a friend who was a nurse look at W.G.'s foot. The nurse testified that the foot was a little swollen and looked like maybe it had a bug bite on the bottom. W.G. was sleeping and did not wake up when the nurse examined the foot. In addition, the nurse testified that she did not observe anything about W.G. that made her think he needed immediate medical attention. Mrs. Grad testified that the nurse suggested that Mrs. Grad soak W.G.'s foot in Epsom salt for a couple days to see if that helped. Mrs. Grad's cousin also saw W.G.'s foot that day and testified that it looked "[v]ery swollen."

{¶34} For the next couple days, Mrs. Grad soaked W.G.'s foot in Epsom salt; however, W.G.'s foot continued to worsen. Thereafter, the Grads asked Mr. Grad's parents what they thought they should do about W.G.'s foot since Mr. Grad's father was a podiatrist. Mrs. Grad testified that they suggested icing the foot and that "they would help [the Grads] find a doctor's appointment" for W.G. The Grads did this for a couple days but W.G.'s foot gradually worsened.

{¶35} On June 13, 2008, Mrs. Grad called the pediatrician to get an appointment for W.G. Mrs. Grad reported W.G.'s symptoms and Mrs. Grad testified that the pediatrician "wanted to see [W.G.] that day." When Mrs. Grad told Mr. Grad about the appointment he said that his parents were getting an appointment for that day or the next. Thus, Mrs. Grad acquiesced in Mr. Grad's decision to call and cancel the appointment with the pediatrician.

{¶36} Mr. Grad did call and try to set an appointment up with a podiatrist that his father had recommended. The podiatrist testified that he would have seen W.G. that day, June 13, 2008, but, unbeknownst to Mrs. Grad, Mr. Grad said he could not bring W.G. in that day. The

podiatrist instructed his staff to let Mr. Grad know that the podiatrist would fit him in if the Grads could make Monday or Tuesday work. Contrary to what the podiatrist said, Mr. Grad told Mrs. Grad that, after relaying W.G.'s symptoms to the podiatrist, the podiatrist thought it would be fine to wait until Tuesday, and thus an appointment was scheduled for June 17, 2008. Nonetheless, Mrs. Grad began to wonder if maybe W.G. might have a fracture because the swelling was not going down in his foot.

{¶37} On June 14, 2008, Mr. Grad gave W.G. a bath. When Mr. Grad came downstairs and handed W.G. to Mrs. Grad, W.G. was crying. Mrs. Grad comforted W.G. and laid him down. Around an hour later, Mrs. Grad went and checked on W.G. and noticed a red mark on his forehead. She asked Mr. Grad what he had done. Mr. Grad explained that after he had finished giving W.G. a bath, Mr. Grad tripped over something on the floor in the bedroom, fell, and W.G.'s head hit the dresser. Mr. Grad said he was hoping Mrs. Grad would not notice the injury because he knew she would be angry with him and get after him about how he handled the baby. After the incident, the Grads called Mr. Grad's parents and they talked to them about the symptoms of a concussion. According to Mrs. Grad, because W.G. was behaving normally, Mrs. Grad did not think W.G. needed to be taken to a doctor. Later, W.G. developed a significant bruise on his head. On June 16, 2008, Mrs. Grad's cousin visited. She testified that W.G.'s foot was swollen on that day, but did not provide more specific details.

{¶38} On June 17, 2008, the Grads took both W.G. and A.G. to the podiatrist. A woman who worked in the podiatrist's office testified that Mr. Grad was "really irritated[]" and that W.G. "cried the entire time he was there." The woman testified that she told Mrs. Grad that, if she needed to feed W.G., that was fine. Mrs. Grad replied that "no, it didn't matter anyway, that he would just cry the whole time." The podiatrist testified that W.G. was "cranky, crying, [and]

very uncomfortable * * * ." When the podiatrist went to examine the left foot and leg, he testified that "[i]t was very difficult, almost impossible to touch, manipulate and try to physically hold and assess * * * the lower extremity, the left foot * * * [because] [i]t hurt, [W.G.] would withdraw." The podiatrist noted that the left foot was extremely black and blue and swollen. He further described that the left leg had a "dink[,]" which he stated meant that the leg "sort of like went in, totally an abnormal feel." The podiatrist became concerned that W.G. had either an infection, a blood clot, or a broken bone and was worried that the injury could be possibly life threatening. The podiatrist, after consulting with the Grad's pediatrician, instructed them to take W.G. to Akron Children's Hospital.

{¶39} After securing child care for A.G., the Grads took W.G. to Akron Children's. There, doctors performed skeletal surveys which revealed W.G.'s numerous fractures, including three fractures in W.G.'s left lower leg, a fracture in W.G.'s foot, and a skull fracture. Dr. Steiner testified that he examined W.G. on June 18, 2008. He testified that there was bruising on W.G.'s left forehead and under his eye and that W.G. had a skull fracture to the back left side of the skull. He stated that the fracture could have been caused by W.G.'s fall into the dresser. In addition, Dr. Steiner testified that he would expect a lay person would seek medical treatment for W.G. if that person saw W.G.'s left foot which was swollen to twice its normal size. The Grads indicated that W.G.'s foot started to swell approximately ten days prior.

{¶40} Based up a thorough review of all the evidence, we cannot say that the trier of fact lost its way in convicting Mrs. Grad of a violation of R.C. 2919.22(A) based upon events occurring from June 6, 2008, through June 17, 2008. In the instant matter, the trier of fact did not explain how it came to the conclusion that Mrs. Grad was guilty of this offense. Based upon the evidence, the trier of fact could have concluded that, based on W.G.'s entire history, by the

weekend of June 13, 2008, Mrs. Grad either suspected W.G. was being abused or was reckless with respect to whether he was being abused. On the other hand, the trier of fact could have concluded that, even if Mrs. Grad did not have reason to suspect Mr. Grad of abusing W.G., given the extent of W.G.'s visible injuries by the weekend of June 13, 2008, Mrs. Grad violated R.C. 2919.22(A), (E)(2)(c) by failing to procure medical attention for the swollen foot and leg and head injury for him at that point and that Mrs. Grad's failure to seek medical attention for W.G.'s swollen foot and leg and head injury until June 17, 2010, did violate a duty of care and created a substantial risk to W.G.'s health. *See Kamel*, 12 Ohio St.3d at 309-310; *Hill,* 2002-Ohio-6285, at ¶ 29; *Allen,* 1995 WL 641134, at *7.

{¶41} We acknowledge that this case presents a close call given that much evidence could be viewed in Mrs. Grad's favor. However, we recognize that the trial court had to weigh a substantial amount of evidence and, its resolution of credibility was critical to its ultimate determination. Given that multiple conclusions could be made from the facts adduced at the trial which hinged on whether certain testimony was believable, we cannot conclude that the trial court's finding of guilty was unreasonable. The trier of fact could have reasonably concluded that by Friday June 13, 2008, Mrs. Grad suspected that W.G. had at least one fracture in his foot. Further, the trier of fact could have reasonably inferred that W.G.'s foot looked similar on June 13, 2008, to the way it did on June 17, 2008, given that there was testimony that W.G.'s foot began to swell beginning ten days prior to going to the hospital visit and was worsening over time. At least one doctor testified that a reasonable person would have sought medical treatment for that foot given what it looked like upon W.G.'s admission to the hospital. Moreover, it would not be unreasonable for the trier of fact to infer that the "dink" the podiatrist noted on June 17, 2008, was also present on June 13, 2008, nor would it have been unreasonable for the trier of

fact to conclude that the "dink" should have caused Mrs. Grad concern given that it was visible in photographs. In addition, Mrs. Grad was aware on June 14, 2008, that W.G. had suffered a head injury which resulted in a red mark and significant bruising; yet, she decided not to have him examined by a doctor for that injury. There was testimony supporting the conclusion that W.G. suffered a skull fracture on that date. The trial court also heard evidence that Mrs. Grad was concerned about the rough manner in which Mr. Grad handled W.G., and there was at least one early incident where W.G. had blood blisters after Mr. Grad cut W.G.'s nails too short. Given all of the evidence, including Mrs. Grad's awareness that Mr. Grad handled the child improperly, her own background and training as a crisis counselor, the trier of fact may not have found Mrs. Grad's testimony that she never suspected Mr. Grad of abusing W.G. from June 6, 2008, to June 17, 2008, to be credible. Alternatively, given the severity of W.G.'s injuries, the trier of fact may have concluded that Mrs. Grad's failure to seek medical treatment at least by the time of the head injury amounted to a violation of R.C. 2919.22(A)/(E)(2)(c). Given our thorough review of the evidence, we cannot say that, upon weighing all of the evidence and assessing the credibility of the witnesses, the trial court lost its way in its determination that Mrs. Grad violated R.C. 2919.22(A)/(E)(2)(c). Accordingly, we overrule this portion of Mrs. Grad's assignment of error.

ASSIGNMENT OF ERROR II

APPELLANT'S RIGHT TO A FAIR AND IMPARTIAL TRIAL AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATE[S] CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION WAS DENIED BY THE COURT'S EXCESSIVE INTERACTION WITH COUNSEL AND WITNESSES DURING THE BENCH TRIAL GIVING THE APPEARANCE OF THE COURT ACTING AS A PROSECUTOR IN THIS MATTER.

{¶42} Mrs. Grad asserts in her second assignment of error that the trial court violated Mrs. Grad's right to a fair trial via its extensive questioning of witnesses in the case. We disagree.

{¶43} "In reviewing any alleged prejudicial errors resulting from the court's own interrogation of a witness, a reviewing court will examine the questions in light of the entire record and, based upon the totality of the circumstances, determine whether there has been a manifest abuse of discretion." *State v. Hoover*, 9th Dist. No. 1549, 1987 WL 12247, *2 (June 3, 1987). Evid.R. 614(B) provides that "[t]he court may interrogate witnesses, in an impartial manner, whether called by itself or by a party."

{¶44} "The evident purpose of Evid. R. 614(B) is to prevent the trial judge, in questioning the witness, from conveying to a jury the judge's impression as to the credibility or lack of credibility of a witness. In the case before us, there was no jury. The trial judge was the finder of fact." *State v. Armstrong*, 2nd Dist. No. 13498, 1993 WL 294834, *5 (Aug. 6, 1993). "Moreover, because this was a bench trial, the trial court is "accorded greater flexibility in questioning witnesses * * * [because] when there is no jury, there is no one to be prejudicially influenced by the judge's demeanor." (Internal quotations and citations omitted.) *State v. Daugherty*, 11th Dist. No. 2001-T-0024, 2002 WL 411105, *2 (Mar. 15, 2002). Further, "[i]n absence of any showing of bias, prejudice, or prodding of a witness to elicit partisan testimony, it will be presumed that the trial court acted with impartiality [in propounding to the witness questions from the bench] in attempting to ascertain a material fact or to develop the truth." (Internal quotations and citations omitted.) *State v. Baston*, 85 Ohio St.3d 418, 426 (1999).

{¶45} In the instant matter, it is true that the trial court was very engaged in the trial and asked questions of the majority of the witnesses throughout the trial. Nonetheless, Evid.R.

614(C) provides that "[o]bjections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present." While occasionally there is an objection made by Mrs. Grad's counsel during the trial court's questioning, there is no evidence that the objection is made because the trial court is conducting the questioning. Instead, the objections appear to be made due to other possible evidentiary issues. Thus, Mrs. Grad has forfeited all but plain error. *See Baston,* at 425. Mrs. Grad has not argued plain error.

**{¶46}** Notwithstanding her failure to argue plain error, we cannot say that the trial court's questioning amounts to plain error. Generally, to establish plain error,

> "[f]irst, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim R. 52(B), an error must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights[ ]' [to the extent that it] * * * affected the outcome of the trial."

*State v. Hardges*, 9th Dist. No. 24175, 2008-Ohio-5567, ¶ 9, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

**{¶47}** Here, the trial court was not selective or biased in its questioning of witnesses. It questioned both prosecution and defense witnesses. Further, some of its questions brought out information damaging to the prosecution, while other questions brought out information damaging to the defense. The impression this Court gets from reading the transcript is that the trial court was attentive, engaged, and clearly concerned with both understanding the issues and facts before it, and getting at the truth of what happened. We cannot say that the trial court's questioning amounted to plain error. Accordingly, Mrs. Grad's second assignment of error is overruled.

III.

{¶48} In light of the foregoing, we sustain Mrs. Grad's first assignment of error in part and conclude that her conviction based upon events that occurred from May 26, 2008, through June 4, 2008, was against the manifest weight of the evidence. Mrs. Grad's conviction stemming from events taking place from June 6, 2008, through June 17, 2008, is affirmed. Mrs. Grad's second assignment of error is overruled. Accordingly, we affirm in part and reverse in part the judgment of the Medina County Court of Common Pleas.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

EVE V. BELFANCE
FOR THE COURT

MOORE, J.
CONCURS.

CARR, J.
DISSENTING.

{¶49} I respectfully dissent from the majority's conclusion that Mrs. Grad's conviction for child endangering as charged in count two of the indictment is against the manifest weight of the evidence.

{¶50} Mrs. Grad does not dispute that the child's injuries were caused by on-going physical abuse. The evidence clearly established that W.G. had dozens of fractures in various stages of healing over a period of less than a month and a half since his birth. Mrs. Grad was trained to recognize signs of child abuse; nevertheless, she offered many different and contradictory explanations to doctors, the police, and the court regarding the injuries sustained by her son. At the same time, the evidence established that Mrs. Grad chastised her husband on a daily basis for his rough physical treatment of the child and that she avoided leaving the child with her husband. The reasonable inference is that she knew or at least had strong suspicions that W.G. was not safe with Mr. Grad, and yet she failed to act to protect the child. In fact, Mrs. Grad admitted that "it was our fault" that the child sustained the injury to his scrotum and that he cried during every diaper change. Nevertheless, she failed to seek immediate treatment for the child, instead waiting until a severe infection set in before taking the child to see a doctor. The pediatric emergency room doctor testified that such an injury would have bled profusely and should have been sutured immediately. Notwithstanding the obvious serious nature of the injury, however, Mrs. Grad waited until the laceration was concealed by the infectious crust of impetigo before taking the child to his pediatrician for a rash elsewhere on his body. Moreover, the trial

was rife with evidence of Mrs. Grad's acquiescing in her husband's decision generally to avoid intervention by medical professionals or to seek medical advice only from professionals who, because of their personal relationships with the Grads, might not be likely to report any suspected abuse.

**{¶51}** As the majority correctly states, "evaluating evidence and assessing credibility are primarily for the trier of fact." *State v. Shue*, 97 Ohio App.3d 459, 466 (9th Dist.1994). Mrs. Grad's inconsistent statements and lies, even where in relation to her other count of child endangering, raise issues regarding her overall credibility and the trial court was in the best position to make that assessment. Mrs. Grad's assertions that she was not aware of the injuries sustained by W.G. at the hands of her husband, given their sheer number and continuous nature, are simply not credible. She knew the child's health and safety were at risk every time he was left in his father's care, yet she failed to take the action necessary to prevent further injuries and seek prompt and proper medical attention for the injuries already evident. Based on a review of the evidence, I would conclude that this is not the exceptional case where the evidence weighs heavily against Mrs. Grad's conviction for child endangering as charged in count two. *State v. Thomas*, 9th Dist. Nos. 22990, 22991, 2006-Ohio-4241, ¶ 8. There is no manifest miscarriage of justice in her conviction based on the evidence adduced at trial. Accordingly, I would overrule her first assignment of error in toto and affirm her conviction.

APPEARANCES:

CONRAD G. OLSON, Attorney at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and RUSSELL A. HOPKINS and ANNE EISENHOWER, Assistant Prosecuting Attorneys, for Appellee.